**Robert POTTS,**

v.

**CITY OF PHILADELPHIA, et al.**

**No. 01 CV 3247.**

United States District Court, E.D. Pennsylvania.

Aug. 29, 2002.

---

Celia Ann Rooney, William W. Spalding, Abraham Bauer & Spalding, P.C., Philadelphia, PA, for Plaintiff.

Denise S. Wolf, Assistant City Solicitor City of Philadelphia Law Department Philadelphia, PA, for Defendant.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

On June 28, 2001, plaintiff, Robert Potts ( "plaintiff" or "Potts"), instituted this action against the City of Philadelphia, former Philadelphia Police Commissioner John Timoney, and numerous police officers, both known and unknown (collectively, "defendants"), asserting multiple claims under 42 U.S.C. § 1983 for violations of his rights under the Second, Fourth, Fifth and Fourteenth Amendments of the United States Constitution, and for various related state law claims. Potts' claims stem from his arrest on November 18, 1999 by Philadelphia police officers for allegedly shooting a gun out of the window of his house.

On January 24, 2002, defendants moved for summary judgment on all claims. On January 29, 2002, Potts filed a motion for leave to file an amended complaint replacing the "unknown police officers" with two individually named officers, Jaison Potts and Stephen Blocker ("Officer Potts" and "Officer Blocker") pursuant to Federal Rule of Civil Procedure 15. These motions are now before me. I will grant plaintiff's motion to amend.[1] I find, however, that even with the amendment to the complaint, Potts cannot survive summary judgment on his claims.

## I. Factual Background[2]

Robert Potts is a 64 year old African American veteran who has been on Social Security Disability since 1978 due to multi-

---

1. Federal Rule of Civil Procedure 15(a) provides that "leave [to amend] shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). "A district court may deny leave to amend a complaint if a plaintiff's delay in seeking amendment is undue, motivated by bad faith, or prejudicial to the opposing party." *Cureton v. National Collegiate Athletic Ass'n*, 252 F.3d 267, 272–73 (3d Cir.2001). The Third Circuit has held that delay alone is insufficient justification for denial of leave to amend. *See id.* at 273. "[A]t some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party." *Id.* (quoting *Adams v. Gould Inc.*, 739 F.2d 858, 868 (3d Cir.1984)).

Here, there is no question that Potts was dilatory in moving for leave to amend the complaint to name the individual police offi-

cers. Potts filed his motion to amend the complaint nearly six months after defendants disclosed the identity of the arresting officers to plaintiff and one month after he deposed the two officers. However, given that Potts has already deposed both officers, and that no further discovery is necessary, I will give Potts the benefit of the doubt that his delay in seeking to amend the complaint was not "undue" or "prejudicial" for purposes of a Rule 15 motion. Defendants do not argue that the amendment is time-barred. Thus, I will grant plaintiff's motion for leave to amend. Accordingly, defendants' argument that Potts' claims against "unknown police officers" must be dismissed for failure to identify the officers is moot.

2. As is appropriate on defendants' motion for summary judgment, the facts are presented in the light most favorable to Potts unless noted.

ple medical conditions. At approximately 6:45 pm on November 18, 1999, Potts was sitting in a room on the first floor of his house at 5225 West Diamond Street in Philadelphia when he heard a loud bang. He went upstairs to the second floor of his house to investigate. He looked out the window and did not see anything unusual. Potts went back downstairs and decided to sit on the front porch of his house to smoke a cigar. (Dep. of Robert Potts, 33).

At this same time, Edna Laughinghouse ("Laughinghouse"), who lives two houses down from Potts, was standing outside her house, near the front steps. (Laughinghouse Investigation Interview Record). According to Laughinghouse, she observed Potts fire a gun out of the second floor window of his house.[3] (11/18/99 Incident Report). She told her daughter to call the police to report that Potts had fired a gun out of his window. (11/18/99 Incident Report; Laughinghouse Investigation Interview Record). Based on this report, the police dispatcher put out a radio call to Philadelphia police officers in the area. (Dep. of Officer Potts, 16). Eight to ten officers responded to the radio call, arriving at 5225 West Diamond Street soon thereafter. Among the responding officers were Officers Potts and Blocker who eventually arrested plaintiff. (*See id;* Incident Report).

Laughinghouse was outside her house when the officers arrived on the scene. Officers Potts and Blocker spoke with Laughinghouse. She informed them that she had seen Potts firing a gun out of his window. (Dep. of Officer Potts, 21–23; Dep. of Officer Blocker, 74). Officer Potts and Blocker also talked to Justin Foster, a teenager who lived across the street from Potts. Foster reported to the officers that

someone had fired a gun out of the window of Potts' house. (Dep. of Officer Potts, 23, 51; Dep. of Officer Blocker, 74; 11/19/99 Incident Report).

After talking to Laughinghouse and Foster, several police officers, including Officers Potts and Blocker, walked up plaintiff's driveway and approached plaintiff who was still sitting on the front porch of his house. (Dep. of Potts, at 33–34). The officers asked Potts if he had fired a gun out of his window. (Plaintiff's Answer to Interrogatories, # 9). Potts responded, "No." (*See id*).

Potts offers slightly conflicting statements about what happened next. In his answers to interrogatories, Potts stated that:

> I was sitting on my porch when approximately 8–10 police officers walked onto my porch and asked if I had been shooting out my window. I told the policemen that I had not. I told the police they could go into my house.

(*See id*). At deposition, taken after he provided answers to interrogatories, Potts testified that:

> [The] officers came up and said somebody called and said I was firing out a window. They asked me had I been firing a gun out the window, I told them no, they told me go in the house ...

(Dep. of Plaintiff, 33–34). When counsel for defendants questioned Potts further about whether or not he told the police they could enter his house, Potts stated:

> [The police] told me to go in the house and, you know, when they told me to go in, I had nothing to hide so I, you know,

---

**3.** While Laughinghouse's statements to the police about the incident conflict with Potts' version of what occurred, Potts does not dispute that Laughinghouse, in fact, made these statements. What Laughinghouse told police is relevant to the issue of whether the police had probable cause to arrest Potts.

did not complain about, you know, going in the house and them coming in there. (Dep. of Plaintiff, 41).

The officers entered Potts' house. They did not have a search warrant. Officer Potts believed that the officers "had permission from Mr. Potts to go inside the house." (*See id* ). When asked at deposition what gave him that impression, Officer Potts responded, "[Plaintiff] wasn't— he wasn't very combative. He wasn't evasive. He was very cooperative." (*See id* ).

Once inside, the officers asked plaintiff if he owned a gun. (Plaintiff's Answer to Interrogatories, # 9; Dep. of Officer Potts, 25). Plaintiff answered "yes" and told them that he had a permit for it. (*See id* ). He retrieved the permit and showed it to Officer Potts who took the permit. (11/18/99 Incident Report). The officers asked plaintiff where he kept his gun, and he explained that it was upstairs. (*See id.;* Dep. of Plaintiff, 33–34). Plaintiff then went upstairs to the second floor of his house with several officers, including Officer Potts, and retrieved the gun from a trash can at the end of his bed. (Plaintiff's Answer to Interrogatories, # 9; Dep. of Plaintiff, 33–34; Dep. of Officer Potts, 27). The gun was in a box along with a box of bullets. (Dep. of Plaintiff, 33–34). Officer Potts seized the gun and the bullets which he later turned over to the Property Department of the Philadelphia Police Department. (*See id.;* Property Receipt). One of the police officers also seized a hunting knife that plaintiff kept on a belt. (Dep. of Plaintiff, 34).

The officers told Potts to get his coat and then handcuffed him. (Dep. of Plaintiff, 35). They asked him if he took medication. Potts responded "yes." The officers put his medication in a bag and brought it with them to the police station. (*See id* ). The medication was to be taken every four to six hours. (Medication Schedule of Robert Potts). The officers

were not violent in handcuffing Potts, nor in escorting him to the patrol car. (Dep. of Plaintiff, 44–45). Potts did not resist. (*See id* ). Officers Potts and Blocker transported plaintiff to the Southwest Detective Division for processing, and plaintiff was eventually placed in the holding cell. (*See id;* Incident Report). Police officers on the scene also transported the two witnesses, Laughinghouse and Foster, to the police station so that they could be interviewed about the incident.

Back at the police station, Officers Potts and Blocker completed an incident report, describing the incident as follows:

[Edna Laughinghouse] stated to police that [Robert Potts] did fire one shot out his bedroom window, in an unknown direction. [Potts] was placed under arrest and taken to [the Southwest division]. Also taken was [Potts' gun] . . .

(11/18/99 Incident Report). The report identified Justin Foster as a witness. (*See id* ). Officer Blocker turned over Potts' gun and box of bullets to the Property Department and signed the property receipt. (11/18/99 Property Receipt). Potts' hunting knife is not listed as an "item of property" seized on this property receipt. (*See id* ).

At the police station, Detective Larry Land was assigned to investigate Potts' case. Detective Land obtained the incident report from Officers Potts and Blocker. Officers Potts and Blocker also gave Land the permit for Potts' gun. (Dep. of Det. Land, 18). Detective Land ran a criminal history check on Potts. (Dep. of Det. Land, 25–26). The criminal history check revealed that Potts had 'no prior criminal history, and that he had a valid permit for his gun. (*See id* ).

Next, Detective Land interviewed Laughinghouse and Foster. Laughinghouse told Land that she had been standing on the steps to her house at approxi-

mately 6:30 p.m. when she heard a noise from Potts' house and saw him raising one of the windows on the second floor of his house. (Laughinghouse Investigation Interview Record, dated 11/18/99). She watched as Potts placed his right hand out the window. She reported that Potts was holding a black object and pointing it in her general direction. Laughinghouse did not know whether he was pointing it at her or not. She then saw two flashes go off near Potts' hand and heard a loud bang. She shouted to neighbors across the street that Potts was firing a gun out of his window. At that point, Laughinghouse observed Potts close the window and turn off the lights. Laughinghouse instructed her daughter to call the police. (*See id*).

After Laughinghouse, Detective Land interviewed Justin Foster. Foster told Detective Land that at approximately 6:45 p.m. he was standing in his front doorway, across the street from Potts' house, when he saw a flash and heard a shot from the second floor window of Potts' house. A light was on in the room and he saw a person but could not identify who it was. Upon hearing the shot, Foster's mother pulled him away from the doorway and inside their house. (Foster Investigation Interview Record, dated 11/18/99).

Based on these interviews, Detective Land recommended to the District Attorney's Office that Potts be charged with Recklessly Endangering Another Person ("REAP"). (Dep. of Det. Land, 28). Detective Land did not interview plaintiff. In making charging decisions, Land typically does not interview suspects because he does not have enough time. (*See id.* at 9). Land sent the relevant documents to the District Attorney's Office which makes the final determination as to whether to charge someone who has been arrested. (*See id.* at 28). Detective Land also sent plaintiff's gun permit along with some type of documentation that Potts had been ar-

rested to the Gun Permit Unit, the unit that oversees the issuance of firearm licenses for the City. (*See id*). Detective Land had no involvement in how Potts was treated in the holding cell; the cell room is in charge of persons arrested and placed in custody. (*See id.* at 21). The District Attorney's Office decided not to charge Potts with a criminal offense. Potts was released at approximately 10 p.m. on November 19, 1999, almost 30 hours after he was arrested. (Dep. of Plaintiff, 51–52).

Potts returned to the police station days later to retrieve his gun, gun permit, bullets, and hunting knife. Detective Land refused to return the items to Potts and told him to "go get a lawyer." (Amended Complaint, ¶ 18).

At some point in the days following Potts' arrest, Detective John Pelosi of the Gun Permit Unit received from Detective Land both Potts' gun permit and some type of notification that Potts had been arrested. Based on the report received from Detective Land that Potts had been arrested, Detective Pelosi made the determination to revoke Potts' gun permit. (Dep. of Det. Pelosi, 27). Pelosi did not interview any witnesses. (*See id*). According to Pelosi, "when a sworn officer notifies me in verbal or written that he had arrested somebody, that is good enough for the police commissioner to have [the person's gun permit] revoked." (*See id.* at 28). It is not necessary that the person be convicted of an offense before the Gun Permit Unit may revoke a license. (*See id*).

Detective Pelosi prepared and sent to Potts a gun permit revocation notice. Dated November 23, 1999, the notice stated:

This is to advise you that your license to carry a firearm is hereby REVOKED in Accordance with SECTION 6109 of the Uniform Firearms Act. Your license to carry a firearm was TERMINATED

and/or REVOKED for good cause as follows:

1) Your character and reputation is such that you would be likely to act in a manner Dangerous to public safety.

2) Your conduct during an incident in which you were involved on and for which you were arrested and charged with REAP.

3) Such other reasons as may become known to [sic] us during our investigation of this revocation.

YOU ARE ADVISED THAT YOU HAVE AN ABSOLUTE RIGHT TO APPEAL THIS DECISION. IF YOU WISH TO APPEAL THIS DECISION YOU MUST DO SO WITHIN THIRTY (30) DAYS OF THE APPEAL DATE OF THIS NOTICE. APPEALS ARE TO BE FILED AT THE BOARD OF LICENSES AND INSPECTIONS REVIEW BOARD DURING NORMAL BUSINESS HOURS.

IT IS FURTHER ADVISED THAT AS OF THIS TIME YOU ARE NOT LICENSED TO CARRY A FIREARM AND ARE SUBJECT TO ARREST FOR CARRYING A FIREARM WITHOUT A LICENSE SHOULD YOU DO SO.

(11/23/99 Notice). The notice was signature stamped from Philadelphia Police Commissioner John Timoney ("Timoney") and listed Detective Pelosi's name and badge number at the bottom. (*See id*).

Potts timely appealed the permit revocation. (Notice of Appeal). The Board of Licenses and Inspections Review ("the Board") scheduled a hearing on Potts' appeal for April 4, 2000. On April 4,2000, the hearing was continued by joint request of the parties so that the Board could look into the matter further. (Board of Licenses and Inspections Review, Transcript of 4/4/00 Hearing). The next hearing was scheduled for June 13, 2000. Witnesses Laughinghouse and Foster failed to appear at the June 13, 2000 hearing. (Board of Licenses and Inspections Review, Transcript of 6/13/00 Hearing ). As a result, the Board concluded that it did not "have sufficient competent evidence to put this hearing on. Therefore, we will issue [Potts'] permit." (*See id*). Potts received a reinstated gun permit in the mail "a couple of weeks later." (Dep. of Plaintiff, 56; Letter of Reinstatement).

## II. Legal Standard

A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The trial court should determine whether there are issues with regard to material facts that warrant a trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, the court must consider the underlying facts in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that might be drawn from those same facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Sempier v. Johnson and Higgins,* 45 F.3d 724, 727 (3d Cir.1995) (en banc). It is appropriate to grant summary judgment if the court finds that the record "could not lead a rational trier of fact to find for the nonmoving party, [and] there is no 'genuine issue for trial.' " *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and ad-

missions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548.

## III. Discussion

Potts asserts a morass of § 1983 claims against the police officers and Police Commissioner Timoney, in their individual capacities and as members of the Philadelphia Police Department, and against the City. Due to a lack of specificity in the complaint, it is difficult to discern precisely what plaintiff's claims are and to which defendants they pertain. A liberal reading of the complaint reveals the following § 1983 claims:

(1) Officers Potts and Blocker violated plaintiff's Fourth Amendment right to be free from unreasonable search and seizure by unlawfully arresting him in his home without a warrant;

(2) Officers Potts and Blocker violated plaintiff's Fourth and Fourteenth Amendment rights by searching his house without a warrant and seizing his property;

(3) Detective Land violated plaintiff's Fourth and Fourteenth Amendment rights by unlawfully detaining him for 30 hours without charging him;

(4) Detective Land violated plaintiff's Fourth and Fourteenth Amendment rights by refusing to return plaintiff's property when plaintiff returned to the police station days after he had been released from custody to obtain the items; and

(5) Detective Pelosi violated plaintiff's Second Amendment right and his Fourteenth Amendment right to due process by revoking his gun permit, and Commissioner Timoney and the City violated his Second and Fourteenth Amendment rights by implementing a policy of revoking gun permits precipitously and without evidence to support the revocation.

■ To establish a claim under 42 U.S.C. § 1983, a plaintiff must show (1) a deprivation of a federally protected right, and (2) that the deprivation was committed by a person acting under color of state law. *Kelly v. Borough of Sayreville, N.J.*, 107 F.3d 1073, 1077 (3d Cir.1997). There is no question in this case that defendants were acting under color of state law. Thus, only the first element is at issue here.

■ Potts' claims raise common issues of supervisory and municipal liability. To establish a claim for supervisory liability under § 1983, a plaintiff must (1) identify the specific supervisory practice or procedure that the supervisor failed to employ, and show that (2) the existing custom and practice without the identified, absent custom or procedure created an unreasonable risk of the ultimate injury, (3) the supervisor was aware that this unreasonable risk existed, (4) the supervisor was indifferent to the risk; and (5) the underling's violation resulted from the supervisor's failure to employ that supervisory practice or procedure. *Brown v. Muhlenberg Township*, 269 F.3d 205, 216 (3d Cir.2001).

■ A municipality may be liable under § 1983 if a plaintiff establishes that its employees violated the plaintiff's civil rights as a result of a municipal policy or practice. *Williams v. Borough of West Chester, PA.*, 891 F.2d 458, 467 (3d Cir. 1989) (citing *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). A plaintiff first must identify the existence of a policy or custom. Next he must:

"demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." If ... the policy or custom does not facially violate federal law, causation can be established only by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir.2000) (citations omitted) (quoting *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). A municipality is not liable under a *Monell* claim unless one of its employees is primarily liable under § 1983. *Borough of West Chester*, 891 F.2d at 467.

I will consider Potts' claims in turn.

**(1) Unlawful Arrest**

■ Potts appears to allege two separate arguments for why his arrest violated the Fourth Amendment's prohibition against unreasonable search and seizure: (1) that the arresting officers, Officers Blocker and Potts, lacked probable cause to arrest him and thus unlawfully seized him, and (2) that the officers unlawfully seized him when they entered his house without a warrant.[4]

1. *False Arrest*

■ To prevail on his claim for false arrest, plaintiff must establish that the arresting officers, Officers Blocker and Potts, lacked probable cause to arrest him for reckless endangerment of another person. Under Pennsylvania law, a person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury. 18 Pa.Cons.Stat.Ann. § 2705. " 'The proper inquiry in a section 1983 claim based on false arrest ... is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense.' " *Groman v. Township of Manalapan*, 47 F.3d 628, 634 (3d Cir.1995) (quoting *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)). Probable cause exists when " 'at the moment the arrest was made ... the facts and circumstances within [the defendant's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the plaintiff had violated the law." *Merkle v. Upper Dublin School Dist.*, 211 F.3d 782, 789 (3d Cir.2000) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).

■ Whether probable cause exists is typically a question for the jury, however a court may conclude "that probable cause exists as a matter of law if the evidence viewed most favorably to Plaintiff would not support a contrary factual finding." *Id.* at 788–89. In making this determination, a court must consider the totality of the circumstances, and weigh the inculpatory evidence against the exculpatory evidence. *Id.* at 789; *Wilson v. Russo*, 212 F.3d 781, 791 (3d Cir.2000).

---

4. To the extent that Potts' complaint asserts an unlawful arrest claim as a violation of the Due Process Clause, I will dismiss this claim as a matter of law. As the Third Circuit explained in *Berg v. County of Allegheny*, 219 F.3d 261 (3d Cir.2000):

The Supreme Court has held that when government behavior is governed by a specific constitutional amendment, due process analysis is inappropriate. Although not all actions by police officers are governed by the Fourth Amendment, the constitutionality of arrests by state officials is governed by the Fourth Amendment rather than due process analysis.

*Id.* at 268–69 (citation omitted).

The facts and circumstances within the knowledge of Officers Potts and Blocker when they arrested plaintiff are as follows: the officers responded to a radio call of someone shooting a gun out of the window at 5225 West Diamond Street (Dep. of Officer Potts, 16); upon arriving at the 5200 block of West Diamond Street, the officers talked to the eyewitness, Laughinghouse, who told them she saw and heard plaintiff fire a gun out of his second floor window (Dep. of Officer Potts, 21–23; Dep. of Officer Blocker, 73; Incident Report); the officers also talked to another eyewitness Justin Foster who told them that he saw someone shoot a gun out of the window of plaintiff's house (Dep. of Officer Potts, 22); when the officers asked plaintiff whether he had fired a gun, plaintiff replied that he had not (Plaintiff's Answers to Interrogatories, # 9); the officers asked plaintiff if he owned a gun, and he told them that he did (Dep. of Officer Potts, 25; Plaintiff's Answers to Interrogatories, # 9); plaintiff led the officers to the second floor of his house where he retrieved his gun and showed it to them (Dep. of Officer Potts, 27; Dep. of Plaintiff 33–34); in the box with his gun was a box of bullets (*see id*).

█ Here, the inculpatory evidence included two independent, seemingly reliable eyewitness accounts of someone shooting a gun out of the second floor window of plaintiff's house, plaintiff's statement that he owned a gun, and the discovery of the gun in a room on the second floor of plaintiff's house. The Third Circuit has held that probable cause exists as a matter of law where an arresting officer relies on "a credible report from a credible eyewitness." *Merkle*, 211 F.3d at 790. Laughinghouse specifically identified plaintiff as the shooter. Foster's account directly corroborated what Laughinghouse told the officers she observed. There is no evidence suggesting that at the time the officers spoke with Laughinghouse and Foster, either witness was incoherent or was fabricating the statements made to the officers.[5] *See Lallemand v. University of Rhode Island*, 9 F.3d 214, 216 (1st Cir. 1993) (probable cause as a matter of law where victim's identification of plaintiff "was positive, and there is no suggestion that she was incoherent or vague when she gave her statements to police or made the photographic identification"); *Grimm v. Churchill*, 932 F.2d 674, 675 (7th Cir.1991) ("When an officer has 'received his information from some person—normally the putative victim or an eyewitness—who it seems reasonable to believe is telling the truth,' he has probable cause") (quoted in *Sharrar v. Felsing*, 128 F.3d 810, 818–19 (3d Cir.1997)).

█ The only exculpatory evidence available to the officers was plaintiff's statement that he had not been firing his gun. In the face of credible eyewitness accounts and the discovery of plaintiff's gun on the second floor of his house, Officers Potts and Blocker were not required to further investigate plaintiff's claim of innocence before determining that they had probable cause to make an arrest. *See Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 439 (7th Cir.1986) (officer had probable cause to arrest for theft based on report of security guard who witnessed plaintiff shoplift items notwithstanding plaintiff's claim of innocence) (cited in

---

**5.** Potts asserts that Laughinghouse's credibility is a question of fact for the jury to decide, yet has come forward with no affirmative evidence in support of that assertion. Potts did not depose Laughinghouse (or Foster). In light of the evidence to the contrary, plaintiff's mere assertion that Laughinghouse lacked credibility is not sufficient to create a genuine issue of material fact precluding summary judgment. *Versarge v. Township of Clinton N.J.*, 984 F.2d 1359, 1365 (3d Cir.1993).

*Merkle,* 211 F.3d at 790 n. 8). A police officer, after all, is not obligated "to conduct a mini-trial" before arresting a suspect. *Brodnicki v. City of Omaha,* 75 F.3d 1261, 1264 (8th Cir.1996).

■ Weighing the inculpatory evidence against the exculpatory evidence, I find that based on the facts and circumstances within their knowledge at the time of the arrest, no reasonable jury could find that Officers Potts and Blocker lacked probable cause to arrest plaintiff. *Merkle,* 211 F.3d at 790. Shooting a gun out of a window when people are present outside undoubtedly constitutes "conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa. Cons.Stat.Ann. § 2705. Accordingly, Officers Potts and Blocker are entitled to summary judgment on plaintiff's false arrest claim.[6]

### 2. *Warrantless Arrest*

■ Plaintiff appears to argue that his arrest also violated his Fourth Amendment right to be free from unreasonable searches and seizures because the officers arrested him within the confines of his home without an arrest warrant. (Pl. Response in Opposition to Def. Motion for Summary Judgment, 10). Pennsylvania law authorizes a police officer to arrest a suspect without a warrant "whenever he has probable cause to believe the defendant has violated [18 Pa.Cons.Stat.Ann.] section 2705 (relating to recklessly endangering another person)." 18 Pa.Cons.Stat. Ann. § 2711. For purposes of the Fourth Amendment, however, "absent exigent circumstances or consent, an entry into a private dwelling to conduct a search or

effect an arrest is unreasonable without a warrant." *Steagald v. U.S.,* 451 U.S. 204, 214 n. 7, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). Defendants contend that Potts consented to the entry of the officers into his house. Consent is voluntary if it is "'the product of an essentially free and unconstrained choice by its maker' and not the result of 'duress or coercion, express or implied.'" *U.S. v. Thomas,* 93 F.3d 479, 486 (8th Cir.1996) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)) (citation omitted). Whether consent is voluntarily given or is the product of duress or coercion is a question of fact determined from the totality of the circumstances. *Bolden v. Southeastern Pennsylvania Transp. Authority,* 953 F.2d 807, 824 (3d Cir.1991) (citing *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041).

Here, the evidence presented, even when viewed in the light most favorable to plaintiff, establishes that plaintiff gave consent to the officers to enter his house. In his Answers to defendants' Interrogatories, plaintiff stated plainly that "I told the police they could go in my house." (Pl. Answer to Interrogatories, # 9). Thus, according to his own words, plaintiff verbally consented to the police entry. Furthermore, Officer Potts testified at deposition that he recalled plaintiff "letting us into the house" and that he believed the officers had plaintiff's permission to enter. (Dep. of Officer Potts, 24). Officer Potts based his belief on the fact that "[plaintiff] wasn't—he wasn't very combative. He wasn't evasive. He was very cooperative." (*See id*). Officer Potts' testimony accords with plaintiff's own statement in his an-

---

**6.** To the extent that the complaint also asserts a municipal liability claim against the City and a supervisory liability claim against Commissioner Timoney for false arrest, these claims fail as a matter of law. A municipal body cannot be held liable for false arrest under § 1983 unless one of its police officers is primarily liable. *See Williams v. Borough of West Chester,* 891 F.2d 458, 467 (3d Cir. 1990). The same holds true for a supervisory liability claim. *See Brown v. Muhlenberg Township,* 269 F.3d 205, 216 (3d Cir.2001).

swers to interrogatories as well as his statement in his response to defendant's motion for summary judgment that "Mr. Potts fully cooperated with the police officers ..." (Pl.Response, 1).

■ In arguing that he did not consent to the officers' entry, plaintiff completely ignores his statement in his answer to interrogatories that he "told the police they could go in my house." Instead, he appears to rely on his testimony at deposition that the arresting officers "told him to go in the house and, you know ... I had nothing to hide so I ... did not complain about ... going into the house and them coming in there." (Dep. of Plaintiff, 41). Plaintiff's deposition testimony, however, does not controvert his earlier statement that he told the police they could enter his house. The fact that the officers told plaintiff to go inside does not preclude the possibility that plaintiff subsequently told the officers, when asked, that they could come inside with him. It is clear from the evidence before me that plaintiff did not object outright to the police entry. To the extent that plaintiff meant to communicate at deposition that he never gave or intended to give the officers permission to enter his house despite his earlier statement to the contrary, plaintiff cannot create a genuine issue of fact by changing his own testimony. "When, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists." *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991). Here, plaintiff has not offered a reason, let alone a satisfactory reason, for his change in testimony.

■ Potts also appears to suggest that any consent he may have given was a product of coercion or duress based on the fact that eight to ten police officers approached him as he was sitting on his porch that night. The mere presence of a number of police officers is not sufficient to establish coercion. *See United States v. Talkington*, 843 F.2d 1041, 1049 (7th Cir. 1988) (the presence of several officers at the time consent is requested is not per se coercive). Potts does not point to any evidence that the officers acted in an aggressive or hostile manner, brandished their weapons, touched him, or even raised their voices. *See U.S. v. Zapata*, 997 F.2d 751, 757 (10th Cir.1993) (valid consent where, among other things, police did not brandish weapons, used a regular tone of voice and did not physically touch the defendant).

The evidence presented by defendants demonstrates that the officers entered Potts' house with his consent. Plaintiff has not met his burden to come forward with sufficient evidence of his own to show that a genuine issue of fact exists. *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Considering the totality of the circumstances, I conclude that no reasonable jury could find that plaintiff did not voluntarily consent to the officers' entry into his house. Accordingly, Officers Potts and Blocker are entitled to summary judgment on this Fourth Amendment claim.

**(2) Warrantless Search and Seizure**

■ Plaintiff also appears to assert a separate Fourth Amendment claim against Officers Potts and Blocker for the warrantless search of his house and seizure of his gun, bullets, gun permit, and hunting knife. With respect to the warrantless search claim, it is clear from the record that plaintiff consented to the "search" for his gun and the other items. According to plaintiff's own statements, once inside his house, the officers asked him if he owned a gun, to which he responded "yes." (Pl. Answers to Interrogatories, # 9). He also informed them that he had a permit for

the gun and retrieved the permit for them. (*See id*). The officers asked plaintiff where he kept the gun; he told them it was upstairs. (*See id*). He then led the officers upstairs and retrieved the gun from a box stored in the trash can in his bedroom. (*See id*). In the box, along with the gun, was the box of bullets that the officers seized. (*See id*). As plaintiff himself states in his response to defendants' motion for summary judgment, "Potts ... agreed to allow [the police] to see his gun and permit." (Pl.Response, 1). Considering the totality of the circumstances and the evidence before me, I conclude that no reasonable jury could find that plaintiff did not voluntarily consent to the search of his house.

■■■■ With respect to the lawfulness of the seizure of plaintiff's property, seizure of incriminating items pursuant to a consensual search does not violate the Fourth Amendment. *See Washington v. Chrisman*, 455 U.S. 1, 9–10, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982). Moreover, under the plain view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 374–75, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). I have already determined that the arresting officers were lawfully inside plaintiff's house, that plaintiff consented to the search for the items, and that plaintiff retrieved the items for the police officers. Given the eyewitness reports that plaintiff had fired a gun out of his window, clearly the gun, bullets, and gun permit were incriminating evidence. Thus, the seizure of the items by the arresting officers was further justified under the plain view doctrine. Accordingly, Officers Potts and Blocker are entitled to summary judgment on plaintiff's claim regarding the unreasonable search and seizure of these items.

As for the hunting knife, plaintiff has not alleged, nor is there any evidence, that either Officer Potts or Blocker seized the knife. The knife is not listed on the property receipt signed by Officer Blocker. (Property Receipt). Neither the complaint nor plaintiff's motion to amend identifies any police officer other than Officers Potts and Blocker who was present at plaintiff's house on November 18, 1999. I will dismiss plaintiff's claim for the unreasonable search and seizure of his hunting knife.

### (3) Unlawful Detention

■■■■ Plaintiff also appears to assert that Detective Land, the detective assigned to investigate his case, violated his constitutional rights by unlawfully detaining him in jail for thirty hours. A plaintiff may assert a § 1983 claim for unlawful detention, also referred to as false imprisonment, under both the Fourth and Fourteenth Amendment. In this context, the Fourth Amendment requires "the States to provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty." *Baker v. McCollan*, 443 U.S. 137, 143, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). A Fourth Amendment unlawful detention claim is foreclosed for plaintiff, however, because of his failure to establish that a genuine issue of fact exists as to whether the police officers had probable cause to arrest him. In *Baker*, the Supreme Court held that because the probable cause standard for pretrial detention is the same as that for arrest, a person arrested based on probable cause cannot establish a claim for unlawful detention under the Fourth Amendment. *Id. See also Groman*, 47 F.3d at 636 ("The Court in *Baker* made it clear that an arrest based on probable cause could not become the source of a claim for false imprisonment"). Because the arresting officers had probable cause to arrest plaintiff as a matter of law, plain-

tiff "is not constitutionally entitled to a separate judicial determination that there is probable cause to detain him pending trial." *Baker*, 443 U.S. at 143, 99 S.Ct. 2689.

▮▮▮ Unlawful detention, however, also implicates the Fourteenth Amendment's protection against deprivation of liberty without due process of law. *See Baker*, 443 U.S. at 142, 99 S.Ct. 2689. The Supreme Court suggested in *Baker* that prolonged detention in the face of a person's protestation of innocence may violate the Fourteenth Amendment:

> We may even assume, arguendo, that, depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty ... without due process of law.'

*Id.* at 143, 99 S.Ct. 2689. However, the Court went on to hold that detention for three days "does not and could not amount to such a deprivation." *Id.*

Here, according to plaintiff's own allegations, he was detained for 30 hours, well short of three days. Thus, under *Baker*, plaintiff cannot establish a claim against Detective Land for unlawful detention as a matter of law.[7]

Moreover, I note, because plaintiff asserts otherwise, that after conducting his investigation into the incident, Detective Land recommended that plaintiff be charged with reckless endangerment of another person. Detective Land did so after interviewing both Laughinghouse and Foster who corroborated their earlier statements to the arresting officers about what they saw and heard that night at plaintiff's house. (Laughinghouse Investigation Interview Record; Foster Investigation Interview Record). Thus, Detective Land had probable cause to recommend that Potts be charged with reckless endangerment. *See Merkle*, 211 F.3d at 790 (probable cause exists as a matter of law where an arresting officer relies on "a credible report from a credible eyewitness"). The District Attorney's Office, not Detective Land, made the final decision not to charge plaintiff with a criminal offense. (Dep. of Det. Land, 28; Dep. of Plaintiff, 51–52). Plaintiff's assertion in his response to defendants' motion for summary judgment that Detective Land "should be held accountable for his failure to release Mr. Potts promptly if no charges were to be filed" is a mischaracterization of what occurred in this case and is baseless.

▮▮▮ Accordingly, I will dismiss plaintiff's claims against Detective Land for unlawful detention.[8]

---

7. Because Potts cannot establish a claim against Detective Land for unlawful detention, he cannot maintain a supervisory liability claim against Commissioner Timoney or a municipal liability claim against the City on this ground. *See supra* note 6.

8. In his response to defendants' motion for summary judgment, plaintiff suggests that his complaint also alleges a claim for malicious prosecution. To state a claim under § 1983 for malicious prosecution, a plaintiff must satisfy the common law elements of malicious prosecution: (1) the defendant initiated a criminal proceeding; (2) which ended in

plaintiff's favor; (3) which was initiated without probable cause; and (4) the plaintiff acted maliciously or for a purpose other than bringing the defendant to justice. *Lee v. Mihalich*, 847 F.2d 66, 69–70 (3d Cir.1988); *Thomas v. Larson*, 2001 WL 185729, at *10 n. 38 (E.D.Pa. Feb.27, 2001). In light of my rulings that the arresting officers had probable cause to arrest Potts and that Detective Land had probable cause to recommend that he be charged with reckless endangerment of another person, Potts cannot prevail on a claim for malicious prosecution. Moreover, plaintiff was never charged with an offense.

#### (4) Unlawful Seizure of Property—Detective Land

██ Potts also alleges that Detective Land violated his constitutional rights (presumably his Fourteenth Amendment rights) by refusing to return Potts' property to him (including his gun and gun permit) when he returned to the police station days after being released to retrieve the items. According to the complaint, when Potts asked for his property back, Detective Land told him to "go get a lawyer." (Amended complaint, ¶ 18). It is not clear from the complaint whether Potts ever secured the return of the seized items from the Police Department. It is undisputed that he received his gun permit back. Thus, it is also not clear whether Potts has suffered any injury.

██ Even assuming Potts has yet to secure the return of the seized items from the police, Potts cannot maintain a § 1983 claim for intentional or even negligent deprivation of property where the state provides an adequate post-deprivation remedy. *See Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) ("an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available"). Pennsylvania Rule of Criminal Procedure 588 provides such a remedy:

> A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

Pa.R.Crim.P. 588(A). Potts has not alleged that this remedy was not adequate, nor has he produced any evidence in support of such a contention. Accordingly, Detective Land is entitled to summary judgment on this claim.

#### (5) Revocation of Gun Permit

Potts' remaining § 1983 claims stem from the revocation of his gun permit. The facts surrounding the revocation of Potts' gun permit are not disputed. At the time of his arrest on November 18, 1999, the arresting officers seized Potts' gun and gun permit. Upon arriving at the police station, one of the arresting officers turned over Potts' gun permit to Detective Land. Detective Land then forwarded the gun permit to Detective Pelosi of the Gun Permit Unit with the information that Potts had been arrested. On that basis, Detective Pelosi determined that Potts' gun permit should be revoked. Pelosi prepared a notice of revocation which was sent to Potts on November 23, 1999. The notice stated:

> This is to advise you that your license to carry a firearm is hereby REVOKED in Accordance with SECTION 6109 of the Uniform Firearms Act. Your license to carry a firearm was TERMINATED and/or REVOKED for good cause as follows:
>
> 1) Your character and reputation is such that you would be likely to act in a manner Dangerous to public safety.
>
> 2) Your conduct during an incident in which you were involved on and for which you were arrested and charged with [Recklessly Endangering Another Person].
>
> 3) Such other reasons as may become known to [sic] us during our investigation of this revocation.

(11/23/99 Notice). The notice also informed Potts that he had 30 days in which to appeal the revocation. (*See id*).

Potts timely appealed the revocation. On June 13, 2000, the Philadelphia Board

of License and Inspection Review ordered that his license be reinstated for lack of "sufficient competent evidence" to support revocation. (Board of License and Inspection Review, Transcript of 6/13/00 Hearing). Soon thereafter, Potts received his permit back.

Potts raises multiple claims involving the revocation of his gun permit against multiple defendants. First, he asserts that Detective Pelosi violated his Second Amendment right to bear arms and his Fourteenth Amendment right to due process by revoking his gun permit based solely on the basis of his arrest on the night of November 18, 1999. Second, Potts claims that Police Commissioner Timoney and the City of Philadelphia violated his Second and Fourteenth Amendment rights by implementing a policy to confiscate the firearms of law-abiding citizens.

### 1. *Second Amendment Claims*

▆▆▆▆ The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *United States v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), the Supreme Court ruled that the Second Amendment does not guarantee an individual's right to bear arms absent "some reasonable relationship" between the "instrument" and "the preservation or efficiency of a well regulated militia." *Id.* at 178–79, 59 S.Ct. 816; *U.S. v. Tot*, 131 F.2d 261, 266 (3d Cir.1942) *rev'd on other grounds* 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943). Thus, under *Miller*, the Second Amendment "establishes no right to possess a firearm apart from the role possession of the gun might play in maintaining a state militia." *Gillespie v. City of Indianapolis*, 185 F.3d 693, 710 (7th Cir.1999). Potts has alleged no facts to suggest that his possession of a gun was related to state militia activities.

Accordingly, his Second Amendment claims against defendants fail.

### 2. *Due Process Claims*

Potts alleges that revocation of his gun permit also violated his Fourteenth Amendment right to due process. The complaint does not specify whether the Fourteenth Amendment claims are based on violations of procedural or substantive due process.

▆▆▆▆ To establish a claim for violation of procedural due process, Potts must demonstrate (1) that he had a legally protected liberty or property interest in his gun permit, and (2) that the state deprived him of that interest without due process of law. *Taylor Inv., Ltd. v. Upper Darby Township*, 983 F.2d 1285, 1293 (3d Cir. 1993). Potts does not suggest that he has a liberty interest in his gun permit, nor can I conceive of any argument in support of that proposition. *See Erdelyi v. O'Brien*, 680 F.2d 61, 63 (9th Cir.1982) (no liberty interest in carrying a concealed firearm). Thus, the relevant inquiry here is whether Potts has a property interest in his gun permit. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Whether or not a benefit granted by the state rises to the level of a protected property interest for purposes of procedural due process is determined by looking to the state law that created the benefit. *Larsen v. Senate of Commw. of Pennsylvania*, 154 F.3d 82, 92 (3d Cir.1998); *Kelly v. Borough of Sayreville, N.J.*, 107 F.3d 1073, 1077 (3d Cir. 1997).

Once the plaintiff has established a legitimate, protected property interest, he or she must then show that the state failed to provide adequate protections prior to the deprivation of that right. Generally, due process "requires that a deprivation of property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667, 680 (3d Cir.1991) (quoting *Cleveland Board of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). In certain emergency situations, the government may postpone the hearing until after the deprivation. *See Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). The extent of protections afforded by the Fourteenth Amendment varies on a case by case basis and is determined by balancing the factors articulated by the Supreme Court in *Mathews v. Eldridge*. In determining what process is due, a court must consider (1) the liberty or property interest at stake in the matter; (2) the value of a procedure in protecting that right; and (3) the efficiency interests of the government in providing the procedure. *See Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

In their summary judgment briefs, both defendants and Potts skip the first step of the procedural due process inquiry, whether Potts has a protected property interest in his gun permit. Because I find it to be dispositive of Potts' claims, I will undertake the analysis.

In determining whether or not Potts has a legally cognizable property interest in his gun permit, I look to the state law creating the interest, section 6109 of the Pennsylvania Uniform Firearms Act. *See Larsen*, 154 F.3d at 92. Cited in Potts' revocation notice, § 6109 governs the issuance and revocation of licenses to carry firearms in Pennsylvania. *See* 18 Pa.Cons.Stat.Ann. § 6109. It provides for revocation of a gun license as follows:

A license to carry firearms may be revoked by the issuing authority for good cause. A license to carry firearms shall be revoked by the issuing authority for any reason stated in subsection (e)(1) which occurs during the term of the permit. Notice of revocation shall be in writing and shall state the specific reason for revocation. Notice shall be sent by certified mail, and, at that time, a copy shall be forwarded to the commissioner. An individual whose license is revoked shall surrender the license to the issuing authority within five days of receipt of the notice. An individual whose license is revoked may appeal to the court of common pleas for the judicial district in which the individual resides.

18 Pa.Cons.Stat.Ann. § 6109(i).

Subsection 6109(e)(1) provides in relevant part:

(1) A license to carry a firearm shall be for the purpose of carrying a firearm concealed on or about one's person or in a vehicle and shall be issued if, after an investigation not to exceed 45 days, it appears that the applicant is an individual concerning whom no good cause exists to deny the license. A license shall not be issued to any of the following:

(i) An individual whose character and reputation is such that the individual would be likely to act in a manner dangerous to public safety.

. . .

(viii) An individual who is charged with or has been convicted of a crime punishable by imprisonment for a term exceeding one year except as provided for in

section 6123 (relating to waiver of disability or pardons).

18 Pa.Cons.Stat.Ann. § 6109(e)(1).

The Third Circuit has held that when a state statute confers broad discretion to a licensing body in issuing licenses, an applicant does not have a protected property interest in the license for purposes of procedural due process. *See Midnight Sessions, Ltd. v. City of Philadelphia,* 945 F.2d 667 (3d Cir.1991). At issue in *Midnight Sessions* was whether applicants for dance hall licenses had a protected property interest in such a license. After reviewing the relevant statutory provisions of the Pennsylvania Dance Hall Act, the Third Circuit held that they did not because the Act conferred broad discretion to the licensing body in deciding whether or not to issue a license. *See id.* at 679. In particular, the court focused on the provision of the statute prohibiting the issuance of a license "until it shall be ascertained that the place for which it is issued ... is a safe and proper place for the purpose for which it shall be used." *Id.* (quoting 53 Pa.Cons. Stat.Ann. § 4736). According to the Third Circuit, "the 'safe and proper' language makes it plain that the City retains discretion to determine the safety and propriety of the operation ... [t]his broad discretion precludes a finding that an applicant has a 'legitimate claim of entitlement' in a dance hall license." *Id.*

Like the Dance Hall Act, both the plain language of section 6109 of the Uniform Firearms Act and case law interpreting this provision make clear that the licensing body, here the City, enjoys broad discretion in both issuing and revoking firearm licenses. The breadth of the discretion conferred to the City under § 6109 is perhaps best evidenced by the clauses prohibiting the issuance and providing for the revocation of a firearm license to "an individual whose character and reputation is such that the individual would be likely to act in a manner dangerous to public safety." 18 Pa.Cons. Stat.Ann. §§ 6109(e)(1), (i). This was the first ground for revocation listed in Potts' revocation notice. (11/23/99 Notice). Like the provision under the Dance Hall Act requiring the licensing body to determine if an applicant dance hall is "safe and proper," the "danger to public safety" ground for revocation of a firearm license confers broad discretion to the City in making a subjective determination about the fitness and suitability of applicants as well as current license holders. *See Midnight Sessions,* 945 F.2d at 680 n. 9 (noting that "[t]he appellees in their brief characterize the 'safe and proper' language [of the Dance Hall Act] as 'nebulous.' That, of course, is our point"). As the Third Circuit concluded in *Midnight Sessions,* such broad discretion "precludes a finding that [ ] [individuals] ha[ve] a 'legitimate claim of entitlement'" in firearm licenses. *Midnight Sessions,* 945 F.2d at 679.

In addition to the plain language of § 6109, Pennsylvania courts have expressly ruled that § 6109, and in particular § 6109(e)(1), grants far-reaching discretion to licensing bodies in issuing and revoking gun permits. As the court in *Harris v. Sheriff of Delaware County,* 675 A.2d 400 (Pa.Cmwlth.1996), stated:

[T]his Court has held that the legislature intended in Section 6109 of the Act to confer discretion on sheriffs, empowering them to exercise judgment in applying the Act's standards to determine if applicants should be licensed. That principle applies also to the sheriff's determination of "good cause" for revocation.

*Id.* at 401 (citation omitted). *See also Tsokas v. Board of Licenses and Inspections Review,* 777 A.2d 1197, 1202 (Pa. Cmwlth.2001) (same).

Although *Midnight Sessions* did not present the situation where the City revoked a license that it had previously granted, as is the case here, I see no reason why this difference compels a contrary conclusion. Section 6109 of the Uniform Firearms Act confers broad discretion to the City in both issuing and revoking firearm licenses. Given that the breadth and nature of the discretion conferred to the City in issuing and revoking firearm licenses under the Uniform Firearms Act is virtually indistinguishable from that conferred to licensing bodies under the Dance Hall Act, I conclude that Potts did not have a protected property interest in his gun permit for purposes of procedural due process.

Although due process property interest analysis is statute-specific, this conclusion comports with the rulings of several other courts which have similarly considered whether an individual has a protected property interest in a gun permit under various state laws. *See Gross v. Norton*, 120 F.3d 877, 878 (8th Cir.1997) (no property interest in gun permit "because local authorities have broad discretion [under Minnesota law] to withhold a permit to carry a pistol"); *Nichols v. County of Santa Clara*, 223 Cal.App.3d 1236, 273 Cal.Rptr. 84, 87 (1990) (plaintiff suing for revocation of gun permit had no property interest in permit "in light of [the gun permit] statute's delegation of such broad discretion to the sheriff"); *Erdelyi v. O'Brien*, 680 F.2d 61, 63 (9th Cir.1982) (applicant has no property interest in gun permit because California statute "explicitly grants discretion to the issuing officer to issue or not issue a license to applicants"); *Conway v. King*, 718 F.Supp. 1059, 1061 (D.N.H.1989) (because "licensing authority has broad discretion to issue licenses" New Hampshire gun permit statute does not confer "a claim of entitlement to a license to carry a concealed weapon").

■ Even if Potts did have a property interest in the revocation of his gun permit, Potts received all the process he was due. Pursuant to § 6109, Potts received written notice of the revocation stating the reasons for the decision, was informed that he had 30 days to appeal the revocation, and through the appeals process, secured the reinstatement of his permit. In *Midnight Sessions*, the Third Circuit held that the same procedure available to applicants denied a dance hall license satisfied the requirements of procedural due process. *See Midnight Sessions*, 945 F.2d at 680–81.

■ I recognize, however, that *Midnight Sessions* differs from this case in one important respect—here the City revoked Potts' license whereas in *Midnight Sessions*, the City denied applications for licenses. When a government body revokes or terminates a benefit or entitlement in which a person has a protected property interest (as opposed to denying the application for such a benefit or entitlement), the holder of the interest is generally entitled to some amount of pre-deprivation "process." *See Alvin v. Suzuki*, 227 F.3d 107, 120 (3d Cir.2000). Although Potts has not clearly articulated his procedural due process argument, I glean from the allegations in the complaint that his primary objection to the City's revocation of his gun permit is that he did not receive sufficient pre-deprivation process, or more specifically, that he did not receive a hearing prior to revocation. His argument appears to be that if he had been given a pre-revocation hearing, the City would not have revoked his gun permit based on his arrest in the first place because the relevant city officials (presumably Detective Pelosi) would have investigated the matter further and discovered that he was never charged with any criminal offense and that

the eyewitness reports leading to the arrest were unfounded.

To determine whether or not Potts was entitled to a pre-deprivation hearing as a matter of law, I consider the *Mathews* factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest. *Alvin,* 227 F.3d at 120. While Potts may have a strong personal interest in his gun permit, the permit does not constitute a basic necessity of life, such as income, or even employment, that would strongly militate in favor of a pre-deprivation hearing. *Compare Goldberg v. Kelly,* 397 U.S. 254, 262, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (termination of welfare benefits requires pre-deprivation hearing because "welfare provides the means to obtain essential food, clothing, housing, and medical care"). In contrast, the City undoubtedly has a prevailing interest in ensuring that persons licensed to carry firearms do not present a danger to public safety. In this sense, the revocation of a gun permit is more analogous to the extraordinary situations in which the Supreme Court has found that no pre-deprivation hearing is necessary. *See e.g., Bowles v. Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944) (no pre-deprivation hearing necessary for rent control order when dealing with exigencies of wartime conditions and inflation control). *See also Morton v. Dow,* 525 F.2d 1302, 1306 (9 th Cir.1975) (plaintiff not entitled to pre-revocation hearing in relation to order revoking airworthiness certification).

As for the second *Mathews* factor, the probable value of additional procedural safeguards, it is certainly possible that a pre-deprivation hearing would have resulted in the outcome Potts envisions, with the City abandoning its effort to revoke his permit. Yet, given the potential fatal consequences of leaving a license to carry a gun (as well as the gun itself) in the hands of someone who poses a danger to the community while he or she pursues a pre-deprivation hearing, surely the benefit of this additional "process" does not outweigh its costs. In this case, the balance of interests weighs heavily in favor of the City and against a pre-deprivation hearing. In light of this conclusion and the fact that the post-deprivation procedures in place ultimately resulted in the reinstatement of Potts' gun permit, I conclude that Potts was not entitled to any more "process" than the City provided pursuant to section § 6109 of the Uniform Firearms Act.

 Lastly, I consider whether Potts can maintain a claim for violation of substantive due process. Again, extrapolating from the allegations in the complaint, Potts could be said to argue that Detective Pelosi's decision to revoke his gun permit based solely on his arrest pursuant to a policy of the City and the Police Department, and implemented by Commissioner Timoney, violates substantive due process. The Third Circuit has held that a plaintiff may establish a substantive due process claim "notwithstanding a constitutionally procedurally adequate scheme." *Midnight Sessions,* 945 F.2d at 683. "A violation of substantive due process rights is proven: (1) if the government's actions were not rationally related to a legitimate government interest; or (2) 'if the government's actions in a particular case were in fact motivated by bias, bad faith or improper motive....'" *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 692 (3d Cir.1993) (quoting *Midnight Sessions,* 945 F.2d at 683).

 Potts cannot prove a substantive due process violation. Even assuming that Potts had a protected property interest in his gun permit for purposes of pro-

cedural due process, not every property interest recognized under a procedural process claim is entitled to substantive due process protection. *See Independent Enterprises Inc. v. Pittsburgh Water and Sewer Authority*, 103 F.3d 1165, 1179–80 (3d Cir.1997). Although the Third Circuit has left "for another day definition of the precise contours of the 'particular quality of property interest' " entitled to such protection, it has indicated that "only fundamental property interests are worthy of substantive due process protection." *Id.* It seems clear that a gun permit does not fall within the purview of "fundamental property interests." As the court noted in *Independent Enterprises*, it has found that land ownership constitutes such a fundamental property interest, but that entitlements to water and sewer services and to bid on government contracts do not. *See id.* at 1180. The entitlement to a gun permit is more akin to the latter, "nonfundamental" type of property interest than ownership of real property. Like the Third Circuit, I "have no difficulty in concluding that the 'property interest alleged to have been infringed here . . . is not the sort of 'fundamental' interest entitled to

the protection of substantive due process." *Id.* Accordingly, to the extent that Potts' complaint alleges a claim for violation of substantive due process stemming from the revocation of his gun permit, the claim will be dismissed.[9]

■ In summary, I conclude that Potts did not have a protected property interest in his gun permit for purposes of procedural due process and, even if he did, the procedures followed by the City in revoking his gun permit afforded Potts all the process he was due. Furthermore, I conclude that Potts' interest in his gun permit does not constitute the type of fundamental property interest afforded substantive due process protection. Thus, Potts cannot survive summary judgment on his due process claims against Detective Pelosi for erroneously revoking his permit. Accordingly, because Potts cannot establish that Detective Pelosi violated his Fourteenth Amendment right to due process, he cannot maintain a vicarious liability claim against either Commissioner Timoney or the City. *See Borough of West Chester*, 891 F.2d at 467. Commissioner Timoney and the City are also entitled to summary judgment on these claims.[10]

---

9. Potts has also alleged that the revocation of his gun permit constituted an unconstitutional bill of attainder. This claim has no merit. A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Administrator of General Services*, 433 U.S. 425, 468, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). The Supreme Court has applied a "functional test of the existence of punishment, analyzing whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Id.* at 475, 97 S.Ct. 2777. Although the complaint does not specify, I presume that Potts means to allege that § 6109 of the Uniform Firearms Act amounts to an unconstitutional bill of attainder. Potts has presented no argument as to how the restrictions imposed by

§ 6109 on gun licenses are designed to inflict punishment on an identifiable group as opposed to furthering "nonpunitive legislative purposes." It is beyond question that the Commonwealth of Pennsylvania has a compelling interest in restricting gun permits in order to ensure the safety of the public. Potts' argument fails.

10. As I noted previously, it is difficult to discern from the complaint the precise nature of plaintiff's claims. With respect to the claims against Timoney and the City, the complaint states:

[T]he actions of all of the Defendants resulted from and were taken pursuant to a de facto policy of the City: to discourage people from attempting to possess firearms pursuant to their constitutional right by means of unlawful arrest, detention, excessive use of force and the denial of necessary

### (6) Remaining Claims

Having considered Potts' litany of § 1983 claims, I conclude that defendants are entitled to summary judgment on all of them.[11] Thus, the only claims remaining are Potts' state law claims.[12]

medical attention implemented by police officer [sic][who] summarily arrest individuals who possess firearms.

(Complaint, ¶ 27). I read this allegation to state a single claim against Timoney and the City for implementing a policy to discourage citizens from possession firearms and not as stating multiple claims against these defendants for implementing policies resulting in unlawful arrest, detention, excessive use of force and denial of necessary medical attention by police officers. Defendants also appear to share in my interpretation of the complaint as stating a single claim for supervisory and municipal liability stemming from the alleged policy of discouraging firearm possession.

In the event that plaintiff intended to assert multiple supervisory and municipal liability claims against Timoney and the City, I need not dwell at length on these potential claims. I already addressed and rejected potential claims against Timoney and the City for unlawful arrest and detention. In light of plaintiff's deposition testimony that the arresting officers did not use excessive force (Dep. of Plaintiff, 44–45), plaintiff cannot maintain an excessive force claim against any of the defendants.

Finally, with respect to a claim against defendants for the denial of necessary medical attention while he was held in custody, although not alleged in the complaint, plaintiff has produced evidence concerning this claim and has submitted it for my consideration at summary judgment. Plaintiff testified at deposition that he began to feel ill while in the holding cell, requested his medication (which he was supposed to take every four to six hours), and had to wait several hours before police officers transported him to the hospital to receive his medication. (Dep. of Plaintiff, 47–48). After being returned to the holding cell, he waited for several more hours, asked for his medication again as well as some water. The police officers in the holding cell unit told plaintiff that they would have to find an officer to transport him back to the hospital for his medication and that they did not have a cup in which to give him water, although they later gave him a carton of iced tea. (See id ). Plaintiff was not taken back to the hospital for his medication, and was eventually released from custody, thirty hours after being arrested. (See id ). Plaintiff's complaint fails to allege any of these facts regarding the denial of medical attention or other inhumane conditions of confinement. More fatal to the claim, however, is the fact that neither the complaint nor plaintiff's motion to amend identifies the police officers allegedly responsible for his confinement conditions. Detective Land testified at deposition that he had no responsibility for plaintiff's treatment while in the holding cell. (Dep. of Det. Land, 21). If plaintiff wishes to pursue a Fourteenth Amendment conditions of confinement claim, he must file a new action against the proper defendants.

11. Defendants also argue that Detectives Land and Pelosi are entitled to summary judgment on the basis of qualified immunity. In light of my ruling that Land and Pelosi are entitled to judgment on plaintiff's claims as a matter of law, I need not decide the issue of qualified immunity.

12. In cursory fashion, the complaint also states that defendants (1) violated Potts' rights under the First Amendment, and (2) are liable under 42 U.S.C. § 1981. Based on the facts as alleged in the complaint, these claims are without merit.

With respect to a claim based on a violation of the First Amendment, the complaint contains no factual allegations that support such a claim, nor does the record before me reveal any basis for the claim. Potts does not allege that he was somehow retaliated against for the valid exercise of his right to freedom of speech. See e.g., Losch v. Borough of Parkesburg, Pa., 736 F.2d 903, 910 (3d Cir.1984). Potts has failed to state a claim for violation of his First Amendment rights. See City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 263 n. 13 (3d Cir.1998) (in considering whether a plaintiff has stated a claim upon which relief can be granted, courts cannot " 'assume that the [plaintiff] can prove facts that it has not alleged' ") (quoting Associated General Contractors of California v. California State Council of Carpenters, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

To state a claim under § 1981, a plaintiff must allege: (1) the plaintiff is a member of a

Potts alleges violations of the Pennsylvania Constitution, specifically Article 1, § 8's prohibition against unreasonable search and seizure and Article 1, § 21's right to bear arms, and also asserts claims for assault, false arrest, false imprisonment, intentional infliction of emotional distress, negligence, and gross negligence under Pennsylvania law. Because I will dismiss Potts' federal claims as a matter of law, I decline to entertain these pendent state law claims and will dismiss them pursuant to 28 U.S.C. § 1367(c)(3). *See Bonenberger v. Plymouth Township*, 132 F.3d 20, 23 n. 1 (3d Cir.1997).

An order follows.

## ORDER

**AND NOW**, this day of August 2002, it is **ORDERED** that:

(1) plaintiff's motion for leave to file first amended complaint (Docket # 11) is **GRANTED**; and

(2) defendants' motion for summary judgment (Docket # 10) is **GRANTED** as to all federal claims, and the amended complaint is dismissed. Pursuant to 28 U.S.C. § 1367(d), plaintiff has thirty days in which to file the state law claims in state court. The clerk's office is instructed to mark this action closed.

racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in § 1981. *North American Roofing & Sheet Metal Co., Inc. v. Building & Const. Trades Council of Phila. & Vicinity, AFL–CIO*, 2000 WL 230214, *2 (E.D.Pa. Feb.29, 2000) (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993)). While the complaint alleges that Potts is a black male, therefore satisfying the first element of a § 1981 claim, it does not allege that any defendant was motivated by or acted with an intent to discriminate against Potts on the basis of race, nor that Potts was in fact discriminated against on account of his race. Thus, Potts has not stated a claim under § 1981.